# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RONALD BRADBERRY,         )
                                  )        3:11-cv-00668-RCJ-VPC
           Plaintiff,       )
                                  )
      v.                   )        **REPORT AND RECOMMENDATION**
                                  )        **OF U.S. MAGISTRATE JUDGE**
NEVADA DEPARTMENT OF   )
CORRECTIONS, *et al.*,      )
                                    )
          Defendants.     )        August 9, 2013
_____)

This Report and Recommendation is made to the Honorable Robert C. Jones, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is defendants' motion for summary judgment (#41).[1] Plaintiff opposed (#49) and defendants replied (#52). The court has thoroughly reviewed the record and recommends that defendants' motion for summary judgment (#41) be granted in part and denied in part.

## I.  HISTORY & PROCEDURAL BACKGROUND

Plaintiff Ronald Bradberry ("plaintiff"), a *pro se* inmate, is currently incarcerated at High Desert State Prison ("HDSP") in the custody of the Nevada Department of Corrections ("NDOC") (#89). On September 19, 2011, plaintiff filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that prison officials violated his constitutional rights while he was housed at Northern Nevada Correctional Center ("NNCC") (#6). The court screened the complaint pursuant to 28 U.S.C. § 1915A, and permitted plaintiff's Eighth Amendment excessive force claim, Fourteenth

_____
[1] Refers to the court's docket numbers.

Amendment due process claim, First Amendment retaliation claim, and supervisory liability claims to proceed (#5, p. 10).  Plaintiff alleges the following:

*Excessive Force*

On September 15, 2009, plaintiff threw a small piece of bread to a bird through the chain-link fence in front of NNCC's prison industries workshop (#6, p. 11).  Defendant Kersten, who was standing on the other side of the fence, told plaintiff to stop throwing things over the fence.  *Id.*  Plaintiff apologized, then proceeded to walk back to his housing unit.  *Id.*  When plaintiff reached the Unit 10 gate, defendant Kersten ran down the fence line and accused plaintiff of throwing another object over the fence.  *Id.* at 12.  Plaintiff told defendant Kersten that he had not thrown anything else over the fence.  *Id.*  Defendant Kersten asked plaintiff for his identification, which plaintiff did not have.  *Id.*  Defendant Kersten then became enraged and ordered plaintiff to lie facedown on the ground.  *Id.* at 12-13.

Plaintiff alleges that defendant Kersten screamed at him while using expletives.  *Id.*  Plaintiff sat on the ground and informed defendant Kersten that he would not respond to anyone who calls him a "piece of shit."  *Id.* at 13.  At that point, defendant Kersten turned toward the gun tower and hysterically screamed for the tower officer to shoot plaintiff and that plaintiff had a weapon.  *Id.*  The tower officer responded that he could not shoot plaintiff because defendant Kersten was in the way. *Id.*  Plaintiff alleges that he remained on the ground, but began to scoot sideways so that the prison industries building would block a shotgun blast from the gun tower, as defendant Kersten "seemed to have lost his mind and was still commanding the tower to 'Shoot him! Shoot him!'"  *Id.* at 14.

At that point, Officer Brooks and a trainee officer arrived and placed plaintiff in handcuffs. *Id.*  Other officers also arrived and removed the items in plaintiff's pockets.  *Id.*  Then defendants Aten, Henson, Wiley and Miller arrived.  *Id.*  Defendant Wiley commented to the other officers,

"You youngsters always show-up first and get to have all the fun." *Id.* Defendant Wiley approached plaintiff (who was lying facedown in handcuffs and leg restraints) and kicked him in the shoulder and chest with the tip of his boot. *Id.* Several officers then lifted plaintiff to his feet. *Id.* at 15. Defendant Miller secured plaintiff's left side; defendant Henson secured plaintiff's right side; and defendant Aten grasped plaintiff's shirt in the back. *Id.* The group began to walk plaintiff backwards toward the administration building. *Id.*

Defendant Wiley then said, "You know what, stop!  I got a better idea.  Take this punk to Unit 7.  I want him charged with assault and battery.  I'll make sure he's sent to Ely, where they don't play." *Id.* At this point, the officers tried to provoke an aggressive reaction from plaintiff. *Id.* at 16.  The escort officers pressed and squeezed plaintiff's handcuffs, while the other officers punched plaintiff in the ribs and back of the head and kneed plaintiff in the thighs, all the while saying, "You're not resisting are you?" *Id.* Plaintiff told the officers that he knew what they were trying to do, but he was not going to react. *Id.* Defendant Miller then stated that he thought plaintiff liked to head-butt. *Id.* at 16-17.  In response to this statement, defendant Wiley pointed his Taser at plaintiff, defendant Miller pushed plaintiff forward violently and then jerked him back forcefully, and defendant Aten yelled that plaintiff was head-butting. *Id.* at 17.  Defendant Wiley hollered, "Everyone saw him lung [sic] at me!" *Id.* The officers knocked plaintiff to the ground and defendant Miller raked plaintiff's face against the asphalt. *Id.* Then, defendant Wiley shot plaintiff in the back with his Taser while defendant Miller yelled for plaintiff to be tasered. *Id.* at 17-18. Defendant Wiley shot plaintiff with the Taser a second time, then ripped the dart hooks out of plaintiff's back, leaving bloody holes. *Id.* at 18.  The officers then walked plaintiff to NNCC's Regional Medical Facility to examine and photograph his injuries. *Id.* at 19.

Plaintiff alleges that during this altercation, there were many other inmates in the vicinity who witnessed the officers' brutality. *Id.* at 18. These inmates had been ordered over the intercom to lie down on the ground, but some of them began to stand up and vocally protest plaintiff's beating. This caused the tower officers to fire their weapons. *Id.* Plaintiff heard one inmate shout, "He's not Rodney King! Stop beating him!" *Id.* The officers grabbed this inmate and took him to Unit 7 along with plaintiff. *Id.*

*Due Process*

Plaintiff alleges that after the September 15, 2009, incident, defendants Miller and Kersten submitted false statements which were used as the basis for a notice of charges against him (#6, p. 20). On October 27, 2009, plaintiff appeared for his disciplinary hearing and requested that inmate Keith Sullivan appear as an eye-witness on his behalf. *Id.* at 21. However, the hearing officer denied plaintiff's request on the grounds that Sullivan's testimony would be duplicative and unnecessary. *Id.* Plaintiff alleges that he was found guilty of all charges and sanctioned to eighteen months of disciplinary segregation and the loss of 180 days of good time credits. *Id.* at 22-23, 30.

*Retaliation*

Plaintiff alleges that he filed inmate grievances and kites protesting the September 15, 2009, incident, but because of this activity, he was transferred to ESP and harassed upon his return to NNCC (#6, p. 32). Plaintiff claims that defendant Wiley expedited his transfer to ESP so that plaintiff could not obtain affidavits from available inmate witnesses. *Id.* Plaintiff also claims that while he was housed at ESP, he suffered a multiple sclerosis attack and was transferred back to NNCC. *Id.* at 35. Within twenty-four hours of his return, defendants Wiley and Cain confiscated 230 pieces of valuable art work, hundreds of outlines and sketches, stamps, and most of plaintiff's legal work, and then generated a false disciplinary report to justify their actions. *Id.* at 35-36.

*Supervisory Liability*

Plaintiff alleges that exaggerated security responses occur on a regular basis against elderly disabled inmates as a matter of unwritten policy, and that defendants Watson, Walsh, Moyle, Palmer, Baca, Ramirez, Fournier, Del Porto and Skolnik refuse to take action to stop these practices (#6, pp. 19, 25). Plaintiff also alleges that his November 16, 2009, grievance was forwarded to defendant Del Porto at the Inspector General's Office, and that he also sent several letters to defendants Palmer, Skolnik and Del Porto; however, these defendants did not investigate the September 15, 2009, incident. *Id.* at 25-26, 39. Plaintiff also alleges that defendants Walsh, Baca, Ramirez, McDaniel and Cox were made aware of the September 15, 2009, incident through the grievance process, but that these defendants failed to take any action and did not permit plaintiff to undergo a polygraph test. *Id.* at 26-31. Finally, plaintiff alleges that he informed defendants Helling, Ramirez, Moyle, Palmer, Del Porto, Watson, Walsh, Fournier and Hartman that his artwork had been confiscated, but these defendants approved of the retaliation and failed to intervene. *Id.* at 36-37.

Defendants allege the following: on September 15, 2009, defendant Kersten observed plaintiff throw bread crumbs over NNCC's prison industries fence (#41, Ex. A, ¶ 4). Defendant Kersten walked over to plaintiff and told him not to throw anything over the fence. *Id.* at ¶ 5. Plaintiff proceeded toward the Unit 10 gate, then stopped and threw another bread crumb over the fence. *Id.* at ¶ 6. Defendant Kersten ordered plaintiff to turn over his identification card, which plaintiff did not have. *Id.* at ¶ 7. Defendant Kersten then explained to plaintiff why he was not allowed to throw anything over the prison industries fence and why he should obey a direct order. *Id.* During this explanation, plaintiff became verbally abusive. *Id.* at ¶ 8. Defendant Kersten radioed for the Search and Escort team to respond to the area to escort plaintiff to speak with the

shift sergeant.  *Id.*  While waiting for the Search and Escort team, defendant Kersten ordered plaintiff to lie facedown on the ground to prevent the situation from escalating.  *Id.* at ¶ 9.  Plaintiff refused and cursed at defendant Kersten.  *Id.* at ¶ 10.  Defendant Kersten ordered plaintiff to lie down several more times.  *Id.*  Plaintiff refused, but eventually sat down on his bottom.  *Id.* Defendant Kersten again ordered plaintiff to lie facedown.  *Id.* at ¶ 11.  Plaintiff complied, although he continued to curse at defendant Kersten.  *Id.*  Defendant Kersten told plaintiff to "stop with the name calling" and to place his hands behind his back.  *Id.*  Plaintiff refused and continued to use profane language.  *Id.*

Defendant Aten arrived and observed plaintiff lying on the ground with his hands tucked under his chest, yelling obscenities at defendant Kersten (#41, Ex. C, p. 4).  Both defendants ordered plaintiff to place his hands behind his back, but plaintiff refused.  *Id.*  As more officers arrived, plaintiff began to comply with their orders and Officer Brooks placed plaintiff in wrist restraints.  *Id.* at 5.  Defendant Aten conducted a clothed body search and confirmed that plaintiff did not have a weapon.  *Id.*  The officers ordered plaintiff to stand up, but plaintiff refused (#41, Ex. D, ¶ 7; #41, Ex. E, ¶ 7).  Instead, plaintiff continued to make profane comments and stated he "aint doin nothing you tell me to do" (#41, Ex. E, ¶ 7).  Defendants Wiley and Miller lifted plaintiff to his feet.  *Id.* at ¶ 8.  Defendants Henson and Miller began to escort plaintiff to the Operations Center.  *Id.*  However, plaintiff continued to struggle with the Search and Escort team, defendant Wiley and defendant Miller (#41, Ex. D, ¶ 8).  Accordingly, defendant Wiley instructed the officers to escort plaintiff to the administrative segregation unit (#41, Ex. D, ¶ 8; #41, Ex. E, ¶ 8).  During the escort, plaintiff continued to wrestle with defendants Henson and Miller, so defendant Wiley told plaintiff to "mellow out" (#41, Ex. D, ¶ 9).  At that point, plaintiff twisted out of defendant Henson's grip and

slammed his right shoulder into defendant Wiley's left shoulder in an attempt to head-butt defendant Wiley (#41, Ex. D, ¶ 11; #41, Ex. E, ¶ 10; #41, Ex. F, ¶ 7; #41, Ex. C).

Defendant Miller took plaintiff to the ground where he continued to resist by attempting to kick defendant Aten, bite defendant Henson's hand, and yell obscenities at all of the responding officers (#41, Ex. E, ¶¶ 12-13; #41, Ex. D, ¶ 13; #41, Ex. F, ¶ 8). Defendant Miller placed his left hand behind plaintiff's left ear and applied pressure, holding plaintiff's head to the ground in an attempt to prevent plaintiff from biting anyone (#41, Ex. E, ¶ 13). However, plaintiff continued to struggle and all the officers ordered plaintiff to stop resisting (#41, Ex. F, ¶ 8; #41, Ex. D, ¶ 17).

To gain compliance, defendant Wiley administered a 5-second cycle with his M26 Taser (#41, Ex. D, ¶ 18; #41, Ex. E, ¶ 15). At that time, other inmates in the area started moving and Tower 3 fired a popper round and ordered all inmates to lie facedown on the ground (#41, Ex. D, ¶ 19). The Taser cycle appeared to enrage plaintiff (#41, Ex. F, ¶ 10). When the cycle was completed, plaintiff attempted to bite defendant Miller's left hand (#41, Ex. E, ¶ 15). Defendant Miller yelled for defendant Wiley to administer a second Taser application. *Id.* After the second Taser cycle, plaintiff stopped resisting and began to comply with orders (#41, Ex. D, ¶ 23; #41, Ex. E, ¶ 16; #41, Ex. F, ¶ 12). The Search and Escort team arrived with leg restraints, and defendant Aten placed them on plaintiff (#41, Ex. F, ¶ 13). Thereafter, the officers escorted plaintiff to NNCC's medical unit without further incident (#41, Ex. D, ¶ 24; #41, Ex. E, ¶ 18). Medical staff found that plaintiff had superficial lacerations to the right side of his face and shoulder, and that plaintiff had four taser wounds on his back (#41, Ex. G, p. 1 (*sealed*)). Thereafter, officers escorted plaintiff to the administrative segregation unit (#41, Ex. F, ¶ 14).

Defendants move for summary judgment on the grounds that: (1) defendants did not use excessive force to restrain plaintiff (#41, pp. 5-9); (2) defendants did not transfer plaintiff to ESP in

retaliation for his protected First Amendment activity (#41, p. 10); (3) defendants did not confiscate plaintiff's tattoo artwork in retaliation for his protected First Amendment activity (#41, p. 12); (4) the notice of charges issued as a result of the September 15, 2009, incident was not based on false or fabricated statements (#41, p. 15); (5) the disciplinary hearing officer properly refused to call plaintiff's requested witness (#41, p. 15); (6) the supervisory defendants did not directly participate in any of the alleged constitutional violations (#41, pp. 16-17); (7) defendants are entitled to qualified immunity (#41, pp. 22-24); and (8) defendants cannot be sued in their official capacities. *Id.* at 24.   Defendants attach several documents to support their motion for summary judgment, including:

1.     the declaration of Robert Kersten (#41, Ex. A);
2.     the declaration of Michael Killian (#41, Ex. B);
3.     plaintiff's September 15, 2009, investigation detail report (#41, Ex. C);[2]
4.     the declaration of Jeffrey Wiley (#41, Ex. D);
5.     the declaration of William Miller (#41, Ex. E);
6.     the declaration of Daniel Henson (#41, Ex. F);
7.     plaintiff's notice of charges, preliminary hearing report and disciplinary hearing report (Disciplinary Forms I, II and III) for Offense in Custody ("OIC") #297081 (#41, Ex. I);[3]
8.     the declaration of Quentin Byrne (#41, Ex. J);
9.     plaintiff's relevant grievance history (#41, Ex. K);[4]
10.    the declaration of Robert Hartman III (#41, Ex. L);
11.    NDOC's Administrative Regulation ("AR") 707 governing the inmate disciplinary process (#41, Ex. M);[5]
12.    plaintiff's notice of charges, preliminary hearing report and disciplinary hearing report (Disciplinary Forms I, II and III) for OIC #309346 (#41, Ex. N);[6]
13.    plaintiff's May 27, 2010, investigation detail report (#41, Ex. O);[7]
14.    the declaration of Adam Watson (#41, Ex. P);
15.    the declaration of Shannon Moyle (#41, Ex. Q);
16.    the declaration of James Baca (#41, Ex. R);
17.    the declaration of Luis Ramirez (#41, Ex. S);
18.    the declaration of Charles Fournier (#41, Ex. T);

---

[2] Authenticated by the declaration of Pamela Del Porto (#41, attachment, ¶ 4).
[3] Authenticated by the declaration of Elizabeth Walsh (#41, attachment, ¶ 8).
[4] Authenticated by the declaration of Elizabeth Walsh (#41, attachment, ¶ 9).
[5] Authenticated by the declaration of Maxine S. Blackwell (#41, attachment, ¶ 5).
[6] Authenticated by the declaration of Elizabeth Walsh (#41, attachment, ¶ 10).
[7] Authenticated by the declaration of Pamela Del Porto (#41, attachment, ¶ 5).

19.   the declaration of Howard Skolnik (#41, Ex. U);

20.   the declaration of Donald Helling (#41, Ex. V);

21.   the declaration of Pamela Del Porto (#41, Ex. W);

22.   the declaration of Elizabeth Walsh (#41, Ex. X);

23.   the declaration of E.K. McDaniel (#41, Ex. Y);

24.   the declaration of James G. Cox (#41, Ex. Z);

25.   the declaration of Jack Palmer (#41, Ex. AA);

26.   plaintiff's relevant medical records (#41, Ex. G (*sealed*));[8] and

27.   NDOC's AR 405 governing the use of force (#41, Ex. H (*sealed*)).[9]

Plaintiff opposes defendants' motion for summary judgment on the grounds that: (1) the correctional officers lied in their reports of the September 15, 2009, incident (#49, pp. 14-17); (2) plaintiff never fought, resisted or attempted to assault any correctional officer on September 15, 2009 (#49, p. 26); and (3) the fact that another inmate yelled, "stop beating him he's not Rodney King" corroborates plaintiff's version of events and indicates that this inmate witnessed a brutal beating (#49, pp. 6-7).[10]

Defendants generally reply that plaintiff has failed to produce any evidence which would indicate that there is a genuine issue of material fact for trial (#52, pp. 2-3).  Defendants argue that plaintiff has conceded that defendant Kersten was on the opposite side of the fence during the entire September 15, 2009, incident, and that he never touched plaintiff.  *Id.* at 3.  Defendants further argue that plaintiff has failed to rebut defendants' arguments related to plaintiff's retaliation and due process claims.  *Id.*  Finally, defendants argue that plaintiff has not submitted any evidence linking any of the named supervisory defendants to the alleged unconstitutional acts.  *Id.*

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*.  "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford

---

[8] Authenticated by the declaration of Ronnalee Knight (#41, attachment, ¶ 5).

[9] Authenticated by the declaration of Maxcine S. Blackwell (#41, attachment, ¶ 4).

[10] Plaintiff has attached multiple exhibits to his complaint (#6), as well as to his opposition to defendants' motion for summary judgment (#49).  Plaintiff has also submitted additional exhibits in a separate "motion" (#36).  On November 5, 2012, the court deferred ruling on this "motion" (#36) until after it had reviewed plaintiff's opposition to defendants' motion for summary judgment to determine whether the evidence provided was duplicative (#54, p. 3).  The court finds that this evidence is not duplicative and will consider it in ruling upon defendants' motion for summary judgment (#41).

plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

**A.    Legal Standards**

### 1.  42 U.S.C. § 1983

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290 (1999).  Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere.  *Albright v. Oliver,* 510 U.S. 266, 271 (1994).  To prove liability under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured by the Constitution or federal statutory law.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

### 2.  Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence

regarding such issues of judgment to allow him to prevail on the merits, he cannot
prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted).  Where reasonable minds
could differ on the material facts at issue, however, summary judgment should not be granted.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and
submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact
for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d
764, 773-74 (9th Cir. 2002).  Once the moving party has met its burden, the party opposing the
motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific
facts showing the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c)
mandates the entry of summary judgment, after adequate time for discovery, against a party who
fails to make a showing sufficient to establish the existence of an element essential to that party's
case, and upon which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the
matters asserted, but must only determine whether there is a genuine issue of material fact that must
be resolved by trial.  *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).
Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a
reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment
motion.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.  Analysis**

As a preliminary matter, the court notes that plaintiff has named NDOC as a defendant in this
action.  However, states and any governmental agency that is an arm of the State are not persons for
the purposes of 42 U.S.C. § 1983.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69

(1997); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).  Therefore, section 1983 claims against states or a governmental agency that is an arm of the State are legally frivolous.  *See Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir. 1989), *superseded by statute on other grounds as stated in Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc).  Because NDOC is an arm of the State, it is not a person for the purposes of 42 U.S.C. § 1983.  *See Doe*, 131 F.3d at 836.  Accordingly, the court recommends that all claims against NDOC be dismissed with prejudice.

### 1. Eighth Amendment Excessive Force

When a prisoner claims that his Eighth Amendment right to be free from cruel and unusual punishment has been violated based on a prison official's use of excessive force, the proper inquiry is whether the force resulted in the unnecessary and wanton infliction of pain or suffering.  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  To determine whether the force used was unnecessary and wanton, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Id.* at 7.  In making this determination, the court considers the following factors: (1) the extent of the prisoner's injury, (2) the need for force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response.  *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  The extent of a prisoner's injury may suggest whether the use of force was necessary in a particular situation.  Although there is no need to show that the prisoner suffered a serious injury as a result of the force, the lack of such an injury is relevant to the inquiry.  *Id.* at 7-9; *see also Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

As the balancing of relevant factors in excessive force cases "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Lolli v. County of Orange*, 351 F.3d 410, 415-16 (9th Cir. 2003); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citing several additional cases).

Plaintiff brings his Eighth Amendment excessive force claim against defendants Kersten, Aten, Henson, Wiley and Miller.  Plaintiff contends that he never fought, resisted or attempted to assault any of the correctional officers, and that the officers generally lied in their reports detailing the September 15, 2009, incident (#49, pp. 14-17, 26).  Plaintiff also contends that the fact that another inmate yelled, "stop beating him he's not Rodney King" supports plaintiff's allegations.  *Id.* at 6-7.[11]  Plaintiff has submitted six inmate affidavits from alleged eye-witnesses to the September 15, 2009, use of force incident.[12]  In one affidavit, an inmate reported his version of the September 15, 2009, incident as follows:

> I witnessed [plaintiff] feeding either birds or squirrels.  An Officer approached [plaintiff and] said something, and all of the sudden started screaming at plaintiff, "sho[o]t him, sho[o]t him, he's got a weapon," and [plaintiff] had what looked like a cracker or piece of bread.  I hit the dirt face turned.  Officers then jumped on [plaintiff] shoving his face into the asphalt and they restrained him.  As the officers began pulling him up, it appeared one struck [plaintiff] in the back, and another kicked him.  Shots had been fired, and then several officers then took [plaintiff] down the road toward Unit 7, and when they got to about the gate at Unit 5, the officers were screaming, "stop resisting" and a [taser] fired.  Officers then repeatedly battered and assaulted [plaintiff] as they dragged or walked him toward Unit 7 area.
>
> At no time did I see/witness [plaintiff] resisting officers but I did hear [plaintiff] screaming, "please stop hitting me."  Numerous inmates witnessed the

---

[11] Plaintiff provides the court with this inmate's name and identification number, but states that he was unable to obtain an affidavit from this inmate, as "defendants were not only scrambling to expedite plaintiff's move to Ely . . . but also kept plaintiff on a 3 man rule and isolated from inmate contact . . . ." *Id.* at 24.

[12] One of these affidavits is attached to plaintiff's opposition (#49, pp. 38-39).  The others are contained in plaintiff's "motion for court to electronically mail or send, AG the following affidavits, motions, and evidence . . ." (#36), which the court will consider here.

assault and battery of [plaintiff] and a black inmate was also taken by officers for telling them to stop hitting [plaintiff].

(#49, pp. 38-39).

In another affidavit, an inmate stated:

On Sept. 9-15-2009, I was outside, in the NNCC Unit 5 yard . . . [when I] noticed some commotion coming down the road . . . I saw [plaintiff] in full restraints, feet and hands, being brutally dragged and beaten by several COs. I recognized s/co Daniel Henson on the right arm of the inmate, and who I later learned was Sgt. William Miller on the left arm while Lt. Jeff [?] seemed to be leading this procession of abusive correctional officers, yelling and jumping around like he had literally lost his mind, wildly waving his "taser gun" around. Also the [correctional officers] in escort had [plaintiff's] han[d]s twisted in a[n] un[n]atural fashion, "To me it look[ed] very painful[]." All the while, it very obvious that g[ua]rds were purposel[]y and brutal[l]y yanking and jerking [plaintiff] back and forth yelling in a sick humorous voice "You['re] not resisting are you!" . . . [Plaintiff] was in full-restraints not resisting unable and total[ly] defen[s]eless to protect himself against the ass[a]ult and battery being inflicted upon him by these out of control[] c/os. He was yelling and in great pain, and it was impossible for him to have been able to "resist" in any signifi[c]ant or realistic man[n]er. . . .

The next thing I and others wit[]nessed was Lt. Wiley ran at [plaintiff] ram[m]ing him hard with his chest while the other officers held [plaintiff] tightly. Then the guards that had [plaintiff] sever[e]ly twisted up, lit[]erally threw him forward where he fell to the ground. This is when Lt. Wiley completely freaked out yelling, "You all saw him try to headbut[] me, you all saw it." Then with the "taser," shot [plaintiff] who was still in full restraints, laying face down on the ground. Sgt. Miller was dragging [plaintiff's] face back and forth on the asphalt sever[e]ly cutting his face and head. At this point a lot of inmates started yelling at the "out of control" pack of guards to stop or they were going to kill [plaintiff], enough was enough! Some inmates started to get up, yelling for the guards, who were not showing any signs of relenting, to stop. I had to look away because it freaked me out pretty bad. We were all seriously pissed, but could do nothing. [Plaintiff] was 100% immobile and helpless. It was like the "Rodney King beating" all over again.

(#36-2, pp. 3-5).

Defendants contend that plaintiff's allegations are contradicted by declarations from five correctional officers, incident reports containing statements from ten correctional officers, and plaintiff's own medical reports (#41, p. 6). Defendants assert that the evidence, when viewed in light of the *Hudson* factors, demonstrates that defendants did not use excessive force to restrain

plaintiff, but acted reasonably under the circumstances.  *Id.* at 6-9.  Defendants aver that they gave plaintiff several opportunities to avoid a physical confrontation; they had a good-faith belief that plaintiff had a weapon on his person; and they exercised no more force than necessary to gain plaintiff's compliance.  *Id.*  Finally, defendants argue that even if the court finds that there are genuine issues of material fact regarding plaintiff's excessive force claim as it relates to defendants Aten, Henson, Wiley and Miller, there is no dispute that the court should grant summary judgment in favor of defendant Kersten.  *Id.* at 9.

As for defendant Kersten, the court finds that plaintiff's allegations do not support an Eighth Amendment excessive force claim.  It is undisputed that defendant Kersten was on the opposite side of the prison industries fence during the entire September 15, 2009, use of force incident (#6, p. 11; #41, Ex. A, ¶ 17).  Defendant Kersten did not assist the other correctional officers in restraining, escorting or tasering plaintiff, and plaintiff has not alleged an Eighth Amendment failure to protect claim.  Further, even if defendant Kersten yelled for the tower officers to shoot plaintiff, as plaintiff alleges, this action is insufficient to support an Eighth Amendment excessive force claim.  *See Oltarzewski v. Ruggiero*, 803 F.2d 136, 139 (9th Cir. 1987) (verbal harassment is not sufficient to state a constitutional deprivation under section 1983).  The court finds that plaintiff has failed to set forth evidence showing that there is a genuine issue of material fact as to defendant Kersten.  Accordingly, the court recommends that defendants' motion for summary judgment be granted as to plaintiff's Eighth Amendment excessive force claim against defendant Kersten.

As for defendants Aten, Henson, Wiley and Miller, there appear to be multiple genuine issues of material fact for trial.  It is undisputed that plaintiff's interaction with defendants began when he threw a bread crumb over the prison industries fence (#6, p. 11; #41, Ex. A, ¶4).  It is also undisputed that at some point during this incident, plaintiff ended up lying on the ground in

handcuffs while defendant Wiley shot his Taser twice into plaintiff's back (#6, pp. 17-18; #41, Ex. D, ¶¶ 18, 22). However, plaintiff and defendants dispute what transpired between and during those events. It is not clear whether plaintiff complied with orders or resisted the correctional officers. It is also not clear what force defendants used against plaintiff and why this force was necessary. *See Parker v. Asher*, 701 F.Supp. 192, 194 (D.Nev. 1988) (stating that the key inquiry under the Eighth Amendment is "the reason for the infliction of [the] injury"). It is wholly contested between the parties whether defendants Aten, Henson, Wiley and Miller acted maliciously towards plaintiff or whether these defendants applied force in a good-faith attempt to maintain order and protect themselves.

Viewing the evidence in the light most favorable to plaintiff—if defendant Wiley kicked plaintiff in the shoulder while he was lying facedown in restraints; if defendants Aten, Henson and Miller punched and kneed plaintiff in an attempt to provoke an aggressive reaction from him; if defendant Miller violently pushed plaintiff forward and then jerked him backwards to make it appear that plaintiff was head-butting; if defendant Miller raked plaintiff's face against the asphalt; and if defendant Wiley shot his Taser into plaintiff's back twice—all while plaintiff was not resisting the correctional officers, a reasonable jury could conclude that defendants' actions constituted excessive force under the circumstances. It is not the court's role to weigh conflicting evidence or make credibility determinations, but only to determine whether there is a genuine issue of material fact for trial. *Summers*, 127 F.3d at 1152. Further, the Ninth Circuit has found that the reasonableness of force used is ordinarily a question of fact for the jury because such cases almost always turn on a jury's credibility determinations. *See Liston*, 120 F.3d at 976 n.10.

The court finds that plaintiff has set forth evidence sufficient to raise a genuine issue of material fact for trial as to whether defendants used force "maliciously and sadistically" rather than

as part of a "good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 7.

Accordingly, the court recommends that defendants' motion for summary judgment be denied as to

plaintiff's Eighth Amendment excessive force claim against defendants Aten, Henson, Wiley and

Miller.

### 2. First Amendment Retaliation

"A prison inmate retains those First Amendment rights that are not inconsistent with his

status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v.*

*Procunier*, 417 U.S. 817, 822 (1974). "Within the prison context, a viable claim of First

Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some

adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such

action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th

Cir. 2005).

Federal courts were not created to supervise prisons, but to enforce the constitutional rights

of all persons, including prisoners. "We are not unmindful that prison officials must be accorded

latitude in the administration of prison affairs, and that prisoners necessarily are subject to

appropriate rules and regulations." *Cruz v. Beto*, 405 U.S. 319, 321 (1982). But prisoners, like other

individuals, have the right to petition the government for redress of grievances, which includes the

First Amendment right to file grievances against prison officials and to be free from retaliation for

doing so. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009). "Of fundamental import to

prisoners are their First Amendment 'rights to file prison grievances . . ..'" *Rhodes*, 408 F.3d at 567

(quoting *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)). "[B]ecause purely retaliatory actions

taken against a prisoner for having exercised those rights necessarily undermine those protections,

such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes,* 408 F.3d at 567.

Plaintiff alleges that he filed inmate kites and grievances protesting the September 15, 2009, incident, and that defendants retaliated against him because of this activity (#6, p. 32). Specifically, plaintiff alleges that defendant Wiley retaliated against him by expediting his transfer to ESP so that plaintiff could not obtain affidavits from available inmate witnesses. *Id.* at 32. Plaintiff also alleges that once he was transferred back to NNCC, defendants Wiley and Cain confiscated 230 pieces of valuable art work, hundreds of outlines and sketches, stamps and most of plaintiff's legal work, and then generated a false disciplinary report to justify their actions. *Id.* at 35-36.

Defendants assert that plaintiff was transferred to ESP to serve his disciplinary segregation as a result of the September 15, 2009, incident—not as a means of retaliation for plaintiff's First Amendment activity (#41, p. 10). Defendants argue that none of the named defendants controlled plaintiff's transfer to ESP, the transfer did not chill plaintiff's First Amendment activity, and the transfer reasonably advanced NNCC's legitimate correctional goal of protecting the institution's safety and security. *Id.* at 10-11. Defendants also assert that plaintiff's artwork was confiscated because tattoo sketches are not permitted in NDOC institutions—not as a means of retaliation for plaintiff's First Amendment activity. *Id.* at 12. Defendants argue that defendants Cain and Hartman did not confiscate plaintiff's artwork because he had filed prison grievances, the confiscation did not chill plaintiff's First Amendment activity, and the confiscation reasonably advanced NNCC's legitimate correctional goal of preventing tattooing in prison. *Id.*

The court finds that plaintiff has failed to set forth any evidence indicating a link between his transfer to ESP and his First Amendment activity of filing inmate kites and grievances. Instead, the evidence indicates that on October 27, 2009, plaintiff was found guilty of assault and battery and

sanctioned to eighteen months of disciplinary segregation (#41, Ex. R, ¶ 6). On December 2, 2009, the institutional classification committee recommended that plaintiff be transferred to ESP to serve his disciplinary segregation (#41, Ex. X, ¶ 7; #41, Ex. J, ¶ 5).[13] This recommendation was approved by the Offender Management Division, and plaintiff was transferred to ESP on December 8, 2009 (#41, Ex. X, ¶ 10). Quentin Byrne, NDOC's Acting Offender Management Administrator, states that the Offender Management Division has the final authority to determine whether an inmate should be transferred to another institution; and that in the normal course of business, NDOC correctional officers do not have authority to approve an inmate transfer between institutions (#41, Ex. J, ¶¶ 7-8). Byrne states that here, the Offender Management Division decided to transfer plaintiff to ESP based on the September 15, 2009, incident. *Id.* at ¶ 10. Byrne also states that none of the named defendants was a member of the Offender Management Division at the time of plaintiff's transfer. *Id.* at ¶ 9.

The court finds that the fact that none of the named defendants had the authority to approve plaintiff's transfer to ESP undermines his claim that defendant Wiley somehow expedited his transfer. Plaintiff has advanced no evidence, other than his own beliefs, to substantiate his allegation that defendants transferred him to ESP in retaliation for his First Amendment activity. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[u]ncorroborated and self-serving testimony" without more, will not create a genuine issue of material fact precluding summary judgment.).

The court also finds that plaintiff has failed to set forth any evidence indicating a link between the confiscation of his artwork and his First Amendment activity of filing inmate kites and grievances. On May 27, 2010, defendant Cain inventoried plaintiff's personal property upon his

---

[13] Defendant Baca, an Associate Warden at NNCC, states that NNCC has limited segregation housing since it is an intake facility for the northern part of Nevada (#41, Ex. R, ¶ 8).

return to NNCC (#41, Ex. O; #41, Ex. L, ¶ 3).  During the inventory process, defendant Cain found multiple sketches on stencil paper and hundreds of other drawings on regular paper (#41, Ex. O; #41, Ex. L, ¶ 5).  Defendant Cain confiscated these sketches and showed them to defendant Hartman (#41, Ex. L, ¶ 7).  Defendant Hartman agreed that the drawings appeared to be tattoo sketches, which are prohibited by Administrative Regulation ("AR") 707.  *Id.* at ¶ 10.  On July 21, 2010, plaintiff was found guilty of possessing tattoo materials and sanctioned to property forfeiture (#41, Ex. T, ¶ 6).  Plaintiff appealed the disciplinary decision, which was upheld.  *Id.* at ¶ 8.

Plaintiff does not set forth any evidence tying the confiscation of his tattoo artwork to his protected First Amendment activity.  Plaintiff's own self-serving statement that defendants Cain and Hartman confiscated these materials in retaliation for his grievance activity is unsupported by the record.  Further, plaintiff has failed to even allege facts supporting a necessary element of his First Amendment retaliation claim—that defendants' retaliation chilled the exercise of his First Amendment rights.  The court notes that plaintiff filed numerous grievances after his December 8, 2009, transfer to ESP and after the May 27, 2010, confiscation of his tattoo artwork (#41, Ex. K).  Plaintiff has also vigorously pursued the current lawsuit.  It appears that plaintiff freely exercised his First Amendment rights regardless of any purported retaliation on the part of defendants.

The court finds that the record does not support plaintiff's retaliation claim.  There is no evidence linking defendants' alleged retaliation with plaintiff's exercise of his First Amendment rights, and there is no evidence that defendants' alleged retaliation chilled the exercise of plaintiff's First Amendment rights.  Accordingly, the court recommends that defendants' motion for summary judgment be granted as to plaintiff's First Amendment retaliation claim.

### 3. Fourteenth Amendment Due Process

Plaintiff alleges that after the September 15, 2009, incident, defendants Miller and Kersten submitted false statements which were used as the basis for a notice of charges against him (#6, p. 20).  Plaintiff also alleges that on October 27, 2009, he attended a disciplinary hearing and requested that inmate Keith Sullivan appear as an eye-witness on his behalf.  *Id.* at 21.  However, defendant Pollock (the hearing officer) improperly denied plaintiff's request on the grounds that Sullivan's testimony would be duplicative and unnecessary.  *Id.*

Regarding plaintiff's due process argument against defendants Miller and Kersten, courts have found that prisoners do not have a constitutionally guaranteed immunity from being falsely accused of conduct which may result in the deprivation of a protected liberty interest.  *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *Freeman v. Rideout*, 808 F.2d 949, 951-52 (2nd Cir. 1986), *cert. denied*, 485 U.S. 982 (1988) (allegation that false evidence was planted by a prison guard does not state a constitutional claim where procedural due process protections were provided); *see also York v. Hernandez*, 2011 WL 2650243, at *n. 3 (N.D. Cal. July 5, 2011); *Tafilele v. Harrington*, 2011 WL 2462750, at *7 (E.D. Cal. June 17, 2011).  Rather, the Fourteenth Amendment provides that a prisoner "has a right not to be deprived of a protected liberty interest without due process of law."  *Sprouse*, 870 F.2d at 452.  Thus, as long as a prisoner receives proper procedural due process, a claim based on the falsity of disciplinary charges, standing alone, does not state a constitutional claim.  *Id.*; *see also Freeman*, 808 F.2d at 951; *Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir. 1984).

The court finds that plaintiff's allegation that defendants Miller and Kersten submitted false statements which were used as the basis for a notice of charges against him does not state a constitutional claim.  Accordingly, the court recommends that defendants' motion for summary

judgment be granted as to plaintiff's Fourteenth Amendment due process claim predicated upon an alleged false notice of charges.

Regarding plaintiff's due process argument against defendant Pollock, the court notes that defendant Pollock has not been served in this case.  On November 5, 2012, the court permitted Sergeant Doug Pollock to be named in this action in place of a doe defendant (#54, p. 1).  Thereafter, plaintiff failed to serve defendant Pollock and the Attorney General's Office did not file a notice of appearance on defendant Pollock's behalf.  On May 20, 2013, the court held a status conference and ordered defense counsel to determine whether her office could accept service on defendant Pollock's behalf; and if so, to file a notice of appearance (#68, p. 1).  On May 21, 2013, defendants filed a notice of non-acceptance of service, as defendant Pollock was no longer employed with NDOC (#69).  Defendants also filed defendant Pollock's last known address under seal (#70 (*sealed*); #71; #72).  On May 29, 2013, plaintiff filed a response (#75).  On June 6, 2013, the court issued an order asking plaintiff to notify the court how he planned to serve defendant Pollock, as defendant Pollock's last known address was for a post-office box in British Columbia, Canada (#82).  On June 14, 2013, plaintiff filed a response stating that he is unable to serve defendant Pollock (#84).

The court finds that plaintiff is unable to effectuate service of process on defendant Pollock. Accordingly, defendant Pollock is necessarily dismissed from this action with prejudice.  Defendant Pollock was the hearing officer at plaintiff's October 27, 2009, disciplinary hearing, and is the only defendant involved in plaintiff's due process claim that he was denied an opportunity to call an inmate witness on his behalf.  Because defendant Pollock is dismissed from this litigation, the court recommends that plaintiff's Fourteenth Amendment due process claim related to his opportunity to call witnesses at his disciplinary hearing be dismissed as well.

**4. Supervisory Liability**

"Liability under [42 U.S.C. §] 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted); *see also Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007). Supervisory personnel are generally not liable under section 1983 for the actions of their employees under a theory of *respondeat superior*. Thus, when a named defendant holds a supervisory position, the causal link between that defendant and the claimed constitutional violation must be established. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). To prevail on a theory of supervisory liability, the plaintiff must establish that the defendant either: "personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or implemented a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Id.* (internal quotations omitted).

Plaintiff makes four allegations with respect to his supervisory liability claims. First, plaintiff generally alleges that defendants Watson, Walsh, Moyle, Palmer, Baca, Ramirez, Fournier, Del Porto and Skolnik were aware of an "unwritten policy" promoting over-exaggerated security responses against elderly disabled inmates, but refused to take action to stop these practices (#6, pp. 19, 25). Defendants have submitted a declaration from each of the above-mentioned defendants, who all state that they are unaware of any "unwritten policy" promoting over-exaggerated use of force against any inmate (#41, Ex. P, ¶¶ 4, 7; #41, Ex. Q, ¶ 6; #41, Ex. AA, ¶ 6; #41, Ex. R, ¶ 11; #41, Ex. S, ¶ 6; #41, Ex. T, ¶ 12; #41, Ex. W, ¶ 8; #41, Ex. U, ¶ 5). Plaintiff has provided no evidence to contradict these declarations.

In addition, plaintiff does not explain how his allegation that the supervisory defendants refuse to investigate over-exaggerated security responses against elderly disabled prisoners is related

to his Eighth Amendment excessive force claim.  The court notes that plaintiff is not an elderly

inmate.  The court also notes that plaintiff does not include any facts or evidence to suggest that the

supervisory defendants promoted a policy or custom of violence, or that they were aware that

defendants Aten, Henson, Wiley and Miller have a history of violent acts which would place the

supervisory defendants on notice that the September 15, 2009, incident would occur.  Plaintiff

simply suggests that the supervisory defendants are liable because they were aware of his after-the-

fact complaints of excessive force.  This post-event knowledge does not amount to a "fail[ure] to act

to prevent" a constitutional violation, given that any actions taken by the supervisory defendants

based on the knowledge that a violent episode had already occurred would not have prevented the

application of force in the first place.  In other words, the supervisory defendants could not have

protected plaintiff from an act that occurred prior to his grievances, relating to an incident that these

defendants did not know would occur.  Plaintiff has failed to submit any evidence that defendants

Aten, Henson, Wiley or Miller engaged in excessive force prior to the September 15, 2009, incident

that would have put these supervisory defendants on notice that the September 15, 2009, incident

would occur.

In short, plaintiff utterly fails to establish any causal link between defendant Watson, Walsh,

Moyle, Palmer, Baca, Ramirez, Fournier, Del Porto and Skolnik's alleged failure to investigate over-

exaggerated security responses against elderly disabled prisoners and his claimed Eighth

Amendment violation.  *See Hansen*, 885 F.2d at 646.  Plaintiff has not produced any evidence to

demonstrate that these supervisory defendants personally participated in plaintiff's altercation with

correctional officers; knew of defendant Aten, Henson, Wiley and Miller's alleged constitutional

violations and failed to act to prevent them; or implemented any policy which impinged upon

plaintiff's constitutional rights.  *See Hansen*, 885 F.2d at 646.

Second, plaintiff alleges that one of his grievances was forwarded to defendant Del Porto at the Inspector General's Office, and that he also sent several letters to defendants Palmer, Skolnik and Del Porto concerning the September 15, 2009, incident, but these defendants failed to investigate his claims (#6, pp. 22, 25-26, 39).[14]   In September 2009, defendant Palmer was the Warden at Lovelock Correctional Center (#41, Ex. AA, ¶ 1).  Defendant Palmer did not supervise NNCC staff or make policy decisions concerning NNCC employees.  *Id.* at ¶¶ 4-5.  Defendant Palmer states that he transferred to NNCC in May 2010; he has no personal knowledge of the September 15, 2009, incident; and his only participation with plaintiff's case was through the grievance process.  *Id.* at ¶¶ 6-7.  In September 2009, defendant Skolnik was the Director of NDOC (#41, Ex. U, ¶ 1).  As Director, defendant Skolnik did not supervise NNCC correctional officers, and states that he has no personal knowledge of the September 15, 2009, incident.  *Id.* at ¶¶ 3-4.

Plaintiff has submitted no evidence to suggest that either defendant Palmer or defendant Skolnik personally participated in the alleged Eighth Amendment violations, knew of the violations and failed to act to prevent them, or implemented a policy so deficient that the policy itself was a repudiation of plaintiff's constitutional rights.  *Hansen,* 885 F.2d at 646.  Accordingly, the court finds that defendants Palmer and Skolnik are not liable in their supervisory capacities for allegedly failing to investigate plaintiff's claims.

As for defendant Del Porto, at all times relevant to this litigation, she was employed as NDOC's Inspector General ("IG") (#41, Ex. W, ¶ 1).  The IG's Office conducts NDOC investigations.  *Id.* at ¶ 3.  The office routinely monitors unusual occurrences and institutional incidents within NDOC, and investigates those incidents if warranted.  *Id.*  Investigations are generally conducted whenever an inmate files a grievance regarding the incident.  *Id.* at ¶ 7.

---

[14] The court notes that plaintiff failed to attach these letters to his complaint or to his opposition to defendants' motion for summary judgment.

Following plaintiff's September 15, 2009, incident, NNCC generated an Investigative Detail Report (#41, Ex. C).  The IG's Office reviewed this report and concluded that there was nothing in the report to lead staff to believe that anything other than what the NNCC correctional officers reported had occurred (#41, Ex. W, ¶ 5).  Thus, the IG's Office determined that no further action was warranted.  Plaintiff's allegation that defendant Del Porto failed to investigate the September 15, 2009, incident is belied by the record.  Accordingly, defendant Del Porto cannot be liable in her supervisory capacity for failing to investigate the September 15, 2009, incident, as an investigation occurred.

Third, plaintiff alleges that defendants Walsh, Baca, Ramirez, McDaniel and Cox were aware of the September 15, 2009, incident through the grievance process, yet these defendants failed to take any action and did not permit plaintiff to undergo a polygraph test (#6, pp. 26-31).

A prison official's review and denial of an inmate's grievances, without more, cannot serve as the basis for liability under 42 U.S.C. § 1983.  *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) ("a prisoner has no constitutional right to prison grievances procedures" (citing *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988)), *cert. denied* 541 U.S. 1063 (2004)); *see also May v. Williams*, No. 2:10–cv–576–GMN–LRL, 2012 WL 1155390, at * 3 (D.Nev. April 4, 2012) (citing *Rider v. Werholtz,* 548 F.Supp.2d 1188, 1201 (D.Kan. 2008) ("The denial of prisoner grievances alone is insufficient to establish personal participation under 42 U.S.C. § 1983.")).  Defendants Walsh, Baca, Ramirez, McDaniel and Cox did not personally participate in plaintiff's alleged constitutional deprivations simply by addressing plaintiff's grievances.  Absent a causal connection between the denial of a grievance and the alleged deprivation, plaintiff's claims against these defendants fail as a matter of law.  *See Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

Finally, plaintiff alleges that he informed defendants Helling, Ramirez, Moyle, Palmer, Del Porto, Watson, Walsh, Fournier and Hartman that his artwork had been confiscated, but these defendants approved of the retaliation and failed to intervene (#6, pp. 36-37).  As previously noted, there is no evidence linking the confiscation of plaintiff's tattoo artwork with the exercise of his First Amendment rights.  There is also no evidence that defendants' alleged retaliation chilled the exercise of plaintiff's First Amendment rights.  Accordingly, defendants Helling, Ramirez, Moyle, Palmer, Del Porto, Watson, Walsh, Fournier and Hartman cannot be held liable in their supervisory capacities because plaintiff was not subjected to a constitutional violation.

The court finds that there are no genuine issues of material fact with respect to plaintiff's supervisory liability claims.  Accordingly, the court recommends that defendants' motion for summary judgment be granted as to plaintiff's supervisory liability claims.

### 5.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1240 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In considering a claim of qualified immunity, the court must determine 'whether the facts that plaintiff has alleged . . . make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of the defendant's alleged misconduct.'"  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Whether a right is clearly established turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  *Id.*  "[A]ll but the plainly incompetent or those who knowingly violate the

law have immunity from suit; officers can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation." *Id.*

When analyzing a claim of qualified immunity, the court must view the facts in the light most favorable to plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Here, there are outstanding questions of material fact regarding defendant Aten, Henson, Wiley and Miller's conduct on September 15, 2009. When viewing the facts in the light most favorable to plaintiff, defendant Wiley kicked plaintiff in the shoulder while he was lying facedown in restraints; defendants Aten, Henson and Miller punched and kneed plaintiff in an attempt to provoke an aggressive reaction from him; defendant Miller violently pushed plaintiff forward and then jerked him backwards to make it appear that plaintiff was head-butting; defendant Miller raked plaintiff's face against the asphalt; and defendant Wiley shot his Taser into plaintiff's back twice—despite the fact that plaintiff did not resist the correctional officers. The general law concerning excessive force was clearly established at the time of the events alleged in plaintiff's complaint. *See Hudson*, 503 U.S. at 6-8 (use of excessive force against prisoner violates Eighth Amendment even when plaintiff suffers no significant injury); *see also Whitley*, 475 U.S. 312 (1986) (unnecessary and wanton infliction of pain against prisoner violates Eighth Amendment). There is simply no merit to the argument that defendants should be shielded from liability because they did not know that beating and tasering a handcuffed, compliant inmate is unlawful or because they believed such conduct was reasonable. A reasonable correctional officer would be on notice that these acts would violate the Eighth Amendment.

Upon resolution of the factual issues, defendants may be relieved of liability; however, if plaintiff's version of events were to prevail at trial, a jury might decide that the conduct alleged amounted to an Eighth Amendment violation. Under such circumstances, the alleged actions are not

protected by qualified immunity.  Accordingly, the court recommends that defendants' motion for summary judgment be denied based on qualified immunity.

### 6. Official Capacity Claims

A suit against a state official in his or her official capacity is not a suit against that official, but rather a suit against the official's office.  Therefore, an official acting in his or her official capacity is not a "person" under section 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989); *accord Hale v. Arizona*, 993 F.2d 1387, 1398 (9th Cir. 1993) (en banc).  Since the state and its officials are not considered "persons" within the meaning of section 1983, "they cannot be held liable under the statute for money damages."  *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003).

Plaintiff names many defendants in both their individual and official capacities.  However, defendants cannot be sued in their official capacities for monetary damages.  *Id.* at 918.  Therefore, to the extent that plaintiff seeks monetary damages, the court recommends that all claims against defendants in their official capacities be dismissed with prejudice.

### III.  CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendants' motion for summary judgment should be granted in part and denied in part.  The court concludes that there are no genuine issues of material fact for trial as to plaintiff's Eighth Amendment excessive force claim against defendant Kersten, plaintiff's First Amendment retaliation claim, plaintiff's Fourteenth Amendment due process claims, and plaintiff's supervisory liability claims.  However, there are genuine issues of material fact for trial as to plaintiff's Eighth Amendment excessive force claim against defendants Aten, Henson, Wiley and Miller.  The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and LR Rule IB 3-2,  the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.    RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#41) be **GRANTED in part** and **DENIED in part** as follows:

**THE COURT RECOMMENDS** that defendant NDOC be **DISMISSED** from this action **with prejudice**.

**THE COURT FURTHER RECOMMENDS** that defendants' motion for summary judgment be **GRANTED** as to plaintiff's Eighth Amendment excessive force claim against defendant Kersten.

**THE COURT FURTHER RECOMMENDS** that defendants' motion for summary judgment be **DENIED** as to plaintiff's Eighth Amendment excessive force claim against defendants Aten, Henson, Wiley and Miller.

**THE COURT FURTHER RECOMMENDS** that defendants' motion for summary judgment be **GRANTED** as to plaintiff's First Amendment retaliation claim.

**THE COURT FURTHER RECOMMENDS** that defendants' motion for summary judgment be **GRANTED** as to plaintiff's Fourteenth Amendment due process claim as it relates to submission of a false notice of charges.

**THE COURT FURTHER RECOMMENDS** that defendant Pollock be **DISMISSED** from this action **with prejudice.**

**THE COURT FURTHER RECOMMENDS** that plaintiff's Fourteenth Amendment due process claim be **DISMISSED** as it relates to plaintiff's opportunity to call witnesses at his October 27, 2009, disciplinary hearing.

**THE COURT FURTHER RECOMMENDS** that defendants' motion for summary judgment be **GRANTED** as to plaintiff's supervisory liability claims against all defendants.

**THE COURT FUTHER RECOMMENDS** that defendants' motion for summary judgment be **DENIED** based on the defense of qualified immunity.

**THE COURT FURTHER RECOMMENDS** that all claims for monetary damages against defendants in their official capacities be **DISMISSED** from this action **with prejudice**.

**THEREFORE, THE COURT RECOMMENDS** that the only remaining claim in this lawsuit is plaintiff's Eighth Amendment excessive force claim against defendants Aten, Henson, Wiley and Miller.

**DATED:** August 9, 2013.

Valerie P. Cooke

_____
**UNITED STATES MAGISTRATE JUDGE**